CHRISTOPHER F. MORALES (SBN# 153152)
Attorney at Law
1 Daniel Burnham Court, Ste 240C
San Francisco, CA 94109
(415) 552-1215
cmoral@aol.com

Attorney for RAGEH AHMED
MOHAMMED AL-MURISI

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>RAGEH AHMED MOHAMMED<br><br>AL-MURISI,<br><br>　　　　　Defendant. | CASE NO.: CR-11-0332-JSW<br><br>DEFENDANT'S BRIEF OPPOSING INVOLUNTARY MEDICATION FOR PURPOSES OF ATTAINING COMPETENCY TO STAND TRIAL<br><br><u>PORTIONS UNDER SEAL</u> |

## INTRODUCTION

On May 8, 2011, Mr. Rageh Al-Murisi was a passenger on American Airlines Flight 1561 en route to San Francisco International Airport. Near the end of the flight, Mr. Al-Murisi got out of his assigned seat and approached the front of the plane. He grabbed the cockpit door handle and attempted to open the locked door. Flight attendant Michael Diaz grabbed Mr. Al-Murisi's right hand and told him that the bathroom was to the left. The interference with the flight crew occurred when Mr. Al-Murisi, who does not speak or understand English, tried to get free of Mr. Diaz's grip and then attempted to hit the cockpit door with his shoulder. Mr. Diaz grabbed Mr. Al-Murisi in a full body hug position. Several other passengers got out of their seats and also grabbed Mr. Al-Murisi. Mr. Al-Murisi struggled and was eventually brought down to the floor of the airplane, without any noted injury to the others. The flight attendants

and passengers used flex cuffs to restrain Mr. Al-Murisi's wrists and ankles, and a passenger—a retired police officer—used his belt to connect the wrist and ankle cuffs. **[REDACTED]**. (Forensic Evaluation, 6.) **[REDACTED]**. (Forensic Evaluation, 6.) **[REDACTED]**. (Forensic Evaluation, 6.) Defense Attorney Christopher Morales declares a doubt as to Mr. Al-Murisi's competency.

On August 16, 2011, The Honorable William Alsup ordered that Mr. Al-Murisi undergo evaluation to determine whether or not he is competent to stand trial and ordered a proposal of a proper course of treatment. An initial evaluation was completed on November 8, 2011 by the forensic psychology staff at the Metropolitan Detention Center in Los Angeles, California, who found Mr. Al-Murisi to be not competent to stand trial and recommended that Mr. Al-Murisi be committed to a federal medical center for further evaluation and treatment for restoration to competency pursuant to 18 U.S.C. Section 4241(d). On December 8, 2011, The Honorable Jeffrey White found Mr. Al-Murisi to be incompetent to stand trial and on December 12, 2011, The Honorable Jeffrey White ordered Mr. Al-Murisi committed to the custody of the Attorney General for four months pursuant to 18 U.S.C. Section 4241(d). In the Forensic Evaluation dated June 4, 2012 and filed on June 12, 2012, the Federal Bureau of Prisons conducted a competency restoration study of Mr. Al-Murisi. **[REDACTED]**. (Forensic Evaluation, 13, 16.) On May 31, 2012, the Court inquired during a Status Conference as to why the defendant has not been returned to the Northern District of California. At present, Mr. Al-Murisi refuses treatment by means of psychotropic medication. The current issue before this Court is whether or not involuntary injection of the medication is appropriate for the purposes of restoring competency to stand trial.

**ARGUMENT**

"The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. That interference is 'particularly severe' in the case of involuntary medication with antipsychotic drugs." *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 687 (9th Cir. 2010) (citations omitted). In *Sell v. United States*, 539 U.S. 166, 180 (2003), the Supreme Court formulated a four-prong standard for determining whether

DEFENDANT'S BRIEF OPPOSING
INVOLUNTARY MEDICATION
CR-11-0332-JSW                           2

involuntary administration of drugs solely for trial competence purposes is permitted. This standard lends itself to only a "rare" finding that involuntary administration of drugs is permissible. *Id.*; *Ruiz-Gaxiola*, 623 F.3d at 687. The court must find that: (1) important governmental interests are at stake; (2) involuntary medication will significantly further those state interests; (3) involuntary medication is necessary to further those interests; and, (4) administration of the drugs is medically appropriate. *Sell*, 539 U.S. at 180-81. The Government must prove each of the four factors by clear and convincing evidence. *Ruiz-Gaxiola*, 623 F.3d at 692.

**1.    Important Governmental Interests Are Not at Stake Because Mr. Al-Murisi's Confinement Has Already Extended Beyond His Sentencing Range.**

The Supreme Court has emphasized that "[c]ourts . . . must consider the facts of the individual case in evaluating the Government's interest in prosecution. *Sell*, 539 U.S. at 180. This Court may consider whether special circumstances exist to lessen the importance of the Government's interest. *United States v. Steward*, 343 Fed. Appx. 252, 253-54 (9th Cir. 2009). This Court may consider as a special circumstance the fact that the defendant has already been confined for a significant amount of time. *Sell*, 539 U.S. at 180; *Steward*, 343 Fed. Appx. at 254; *see also United States v. Hernandez-Vasquez*, 513 F.3d 903, 918 (9th Cir. 2008) (citing *Sell* and explaining that relevant circumstances to be considered in evaluating the Government's interest in prosecution include "the time a defendant has served while awaiting trial and the possibility of future civil confinement.").

Mr. Al-Murisi has been in custody for over one year since the alleged incident on May 8, 2011. As Mr. Al-Murisi likely faces an Offense Level 9 charge (the default base offense level for interference with a flight crew member) and he has no criminal history, he is facing a sentencing range of 4-10 months without any potential enhancements. Therefore, considering the length of his potential sentence, he has already been confined for "a significant amount of time" because his current confinement has lasted longer than his potential sentence. Another special circumstance exists if the defendant will likely face further confinement due to his mental state. The Supreme Court explains that "[t]he defendant's failure to take drugs voluntarily, for

example, may mean lengthy confinement in an institution for the mentally ill—and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Sell*, 539 U.S. at 180; *Steward*, 343 Fed. Appx. at 254.

Mr. Al-Murisi may face a lengthy confinement for his mental illness if he remains incompetent to stand trial. According to the Forensic Evaluation of Mr. Al-Murisi conducted at the Federal Medical Center in Butner, North Carolina, **[REDACTED]**. (Forensic Evaluation, 12.) Under 18 U.S.C. Section 4241(d), Mr. Al-Murisi has been found incompetent to stand trial and has been in the custody of the Attorney General for six months, which is two months longer than the statutory maximum of four months that is allowed for determination as to whether there is a substantial probability that Mr. Al-Murisi will attain capacity in the foreseeable future. This Court may further hospitalize the defendant for an additional reasonable period of time if it determines there is a substantial probability that he will attain capacity to permit the trial to move forward. 18 U.S.C. Section 4241(d)(2)(A). As of May 31, 2012, the Court has inquired during a Status Conference as to why the defendant has not been returned to the Northern District of California. Because Mr. Al-Murisi may face many more months, if not years, of further hospitalization, Mr. Al-Murisi fits precisely into that "special circumstance" contemplated in *Sell* that lessens the Government's important interest in pursuing competency for purposes of a trial.

**2. Involuntary Medication Will Not Significantly Further the Government's Interests Because the Potential Side Effects May Interfere With Mr. Al-Murisi's Ability to Assist Counsel.**

To authorize involuntary medication, this Court "must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Sell*, 539 U.S. 166 at 181.

It is unclear whether a drug treatment regimen would likely restore Mr. Al-Murisi to competency to face trial without first reviewing his complete medical and clinical history. Mr. Al-Murisi is a citizen of the Republic of Yemen, residing in the United States with a visa. He was born and raised in Yemen and thus there is no accurate history of his medical background or

DEFENDANT'S BRIEF OPPOSING
INVOLUNTARY MEDICATION
CR-11-0332-JSW 4

his mental health. Further, he has never been subjected to antipsychotic medication in the United States. His medical and clinical history should certainly be reviewed prior to administering doses of psychotropic drugs; to inject powerful antipsychotic drugs into Mr. Al-Murisi without such crucial knowledge could pose a risk to his health.

According to the Forensic Evaluation, **[REDACTED]**. (Forensic Evaluation, 26.) The list of potential side effects that the Forensic Evaluation presents is extensive: extrapyramidal symptoms such as parkinsonism (manifests as stiffness, shuffling, tremor akinesia slow movements, stooped posture, difficulty walking), akathisia, and dystonic reactions (neck dystonia, tongue dystonia, jaw dystonia, rolling back of the eyes and arching of the neck, twisting abnormal postures). (Forensic Evaluation, 18-19.) Dystonic reactions are most prevalent in young males. (Forensic Evaluation 18.) The treatments used to minimize some of these extrapyramidal symptoms also have potential side effects including inhibition/retrograde ejaculation, slowing of heart rate, hypotension, and impotence.

Furthermore, a second category of tardive symptoms are late appearing and often irreversible. These symptoms include involuntary movements of the face, twitching limbs, gasping or forceful breathing. (Forensic Evaluation, 19.) One of the factors that determines how the recipient of the drugs will react is genetic predisposition (Forensic Evaluation, 19), which is impossible to know currently because the doctors do not have access to Mr. Al-Murisi's medical records from Yemen, if they still exist. Most seriously, sudden death and neuroleptic malignant syndrome can occur in rare cases, with an increased incidence in young males treated with long acting depot medications. Mr. Al-Murisi is a 29 year old male **[REDACTED]** (Forensic Evaluation. 26.) It is not medically appropriate nor in Mr. Al-Murisi's best interest to administer psychotropic drugs when there is no way to know if he could have serious adverse reactions to the medication based on his medical history.

3. **Involuntary Medication Is Not Necessary to Further the Government's Interests.**

According to the *Sell* Court, this Court "must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results" and "the court must consider less intrusive means for administering the drugs, e.g. a court order to the defendant backed by the

DEFENDANT'S BRIEF OPPOSING
INVOLUNTARY MEDICATION
CR-11-0332-JSW                                        5

contempt power, before considering more intrusive methods." *Sell*, 539 U.S. at 181. There are alternatives to involuntary medication before this Court. First, the Court may order Mr. Al-Murisi to undergo nondrug psychotherapy. According to the American Psychological Association:

> "Consideration of non-drug therapies is particularly important where . . . the specific therapeutic goal is helping an individual develop or recover functional abilities, such as assisting his attorney during a criminal trial. . . . Indeed, antipsychotic drugs are not designed to develop abilities and skills at all; rather, they are intended to suppress symptoms of certain mental disorders. Thus, determining the appropriate treatment (if any) for attempting to restore a defendant's competence to stand trial must take account of treatments designed specifically to address trial incompetence. It is here that psychological approaches, including psychosocial and psychoeducational therapies, may be most useful. Because these kinds of treatment can be designed specifically to address trial incompetence, they may be able to achieve targeted results better than antipsychotic medication alone."

Brief for American Psychological Association as Amicus Curiae at 12-13, *Sell v. United States*, 539 U.S. 166 (2003) (No. 5664). Second, the Court may order that Mr. Al-Murisi be moved to a facility in California, where his family resides, so that they may have access to him and discuss with him the pros and cons of taking the medication voluntarily. He is much more apt to listen to his family because he trusts their opinion. Moreover, according to 18 U.S.C. Section 4247(b), Mr. Al-Murisi should be currently housed in the suitable facility closest to the court for his psychological examination.

### 4. The Involuntary Injection of Antipsychotic Drugs Is Not Medically Appropriate In Light of Mr. Al-Murisi's Unknown Previous Medical History.

The Court "must conclude that the administration of drugs is . . . in the patient's best medical interest in light of his medical condition." As mentioned above, there is no accessible medical or clinical history for Mr. Al-Murisi due to the fact that he has spent most of his life in Yemen. It is very difficult to know how his body and mind will react to powerful psychotropic drugs with the vast majority of his medical and mental health history left as an unknown.

### CONCLUSION

The ultimate question before this Court is: "[h]as the Government, in light of the efficacy, the side effects, the possible alternatives, and the medical appropriateness of a particular course

DEFENDANT'S BRIEF OPPOSING
INVOLUNTARY MEDICATION
CR-11-0332-JSW                6

1 of antipsychotic drug treatment, shown a need for that treatment sufficiently important to
2 overcome the individual's protected interest in refusing it?" *Sell v. United States*, 539 U.S. at
3 183.  For the foregoing reasons, the defense asks that the Court answer "no" to this question and
4 decline to order involuntary medication of Mr. Al-Murisi.

6 Dated: June 28, 2012                              Respectfully submitted,

_____
Christopher Morales
Attorney for Rageh Ahmed
Mohammed Al-Murisi

DEFENDANT'S BRIEF OPPOSING
INVOLUNTARY MEDICATION
CR-11-0332-JSW                          7