**United States District Court**
For the Northern District of California

1

2

3

4

5          **NOT FOR PUBLICATION**

6          IN THE UNITED STATES DISTRICT COURT

7

8          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9    UNITED STATES OF AMERICA,                    **REDACTED**

10          Plaintiff,                            No.  CR 11-00332 JSW

11    v.                                          **ORDER DENYING REQUEST TO
                                                  INVOLUNTARILY MEDICATE
12    RAGEH AHMED MOHAMMED AL-                    DEFENDANT AND SETTING
      MURISI,                                     STATUS CONFERENCE**
13
            Defendant.
14

15    _____/

16                          **INTRODUCTION**

17          This matter comes before the Court upon consideration of a request to involuntarily

18    medicate Defendant, Rageh Ahmed Mohammed Al-Murisi ("Al-Murisi"), for the purposes of

19    restoring him to competency.  The Court has considered the parties' papers, relevant legal

20    authority, and the record in this case.  The Court recognizes the seriousness of the offense with

21    which Al-Murisi is charged, and it does not intend to minimize the offense conduct.  Rather, the

22    Court's decision, set forth below, is based on its conclusion that the Government has not met its

23    high burden to show that this is one of the rare cases where an order for involuntary medication

24    is required.  Accordingly, for the reasons set forth in the remainder of this Order, the Court

25    DENIES the request to involuntarily medicate Al-Murisi, and it sets this matter down for a

26    status conference on November 1, 2012 at 1:30 p.m.

27          It is FURTHER ORDERED that the parties shall submit a joint status report to the Court

28    by no later than October 29, 2012, setting forth their respective positions on how this case

1  should proceed and whether a further evaluation of Al-Murisi's competency to stand trial is

2  necessary.

3                                **BACKGROUND**

4          On May 19, 2011, the Grand Jury returned an Indictment charging Al-Murisi with one

5  count of interference with a flight crew members and attendants, in violation of 49 U.S.C.

6  section 46504.  These charges stem from an incident that occurred on May 8, 2011, on

7  American Airlines flight 1561 from Chicago, Illinois to San Francisco ("Flight 1561").  The

8  Government alleges that as Flight 1561 prepared to land, Al-Murisi left his seat near the rear of

9  the aircraft, walked toward the first class section of the plane while saying Allah Akbar, and

10  attempted to forcibly enter the cockpit.  (*See, e.g.,* Docket No. 1, Criminal Complaint, ¶¶ 6-7;

11  Docket No. 4, Detention Order at 3:13-15.)  The Government also alleges that as a purser

12  struggled with Al-Murisi, at least three passengers attempted to physically restrain Al-Murisi,

13  and it alleges that Al-Murisi continued to struggle even after his hands and feet had been

14  restrained with flex-cuffs and a passenger's belt.  (Criminal Complaint, ¶¶ 6-7; Detention Order

15  at 3:16-19.)

16          On May 23, 2011, at the Al-Murisi's request, Dr. Pablo Stewart evaluated his mental

17  health status.  (*See, e.g.,* Docket No. 15, June 23, 2011 Minute Order of Proceedings; Forensic

18  Evaluation dated May 29, 2012 ("Forensic Evaluation") at 2.)  On July 21, 2011, Dr. Stewart

19  prepared a report in which he opined that Al-Murisi suffered from a ███████████████

20  ████████████████  (*See* Forensic Evaluation at 2.)  On or about June 29, 2011, Al-

21  Murisi, through counsel, filed an unopposed motion to determine whether Al-Murisi was

22  competent to stand trial, and the Court granted that motion on July 5, 2011.  (Docket Nos. 18,

23  20.)

24          On July 28, 2011, Dr. John Chamberlain submitted a report in which he opined that Al-

25  Murisi met the diagnostic criteria for a ████████████████  which was characterized by

26  "████████████████████████████████"  (July 28, 2011

27  Report of Dr. John Chamberlain ("Chamberlain Report") at 1, ¶ 1.)  Dr. Chamberlain also

28

1   opined that Al-Murisi's ███████████████████ impaired his ability to assist properly

2   in his defense and, as such, was not competent to stand trial.  (*Id.*, at 1, ¶¶ 3-4.)

3        On August 11, 2011, the parties appeared before the Court, and the Court found that Al-

4   Murisi was not competent to stand trial and committed him to the custody of the Attorney

5   General for further evaluation and treatment.  On August 16, 2011, the Court issued an Order to

6   that effect.  (*See* Docket Nos. 23, 25.)[1]

7        On November 10, 2011, the Court received an evaluation from Tiffany Brown, Psy.D.

8   and Ralph Ihle, Ph.D.  (Docket Nos. 33, 34.)  Drs. Brown and Ihle opined that Al-Murisi met

9   the diagnostic criteria for ████████████ and that he was incompetent to stand trial.[2]

10  On December 6, 2011, the parties submitted a stipulation in which they waived an evidentiary

11  hearing and submitted that the forensic evaluation would support a finding by a preponderance

12  of the evidence that Al-Murisi suffered from a mental disease or defect that would render him

13  mentally incompetent to stand trial.  (Docket No. 36.)  On December 8, 2011, the parties

14  appeared before the Court.  The Court found the Defendant incompetent to stand trial and

15  committed him to the custody of the Attorney General to determine whether there was a

16  substantial probability that in the foreseeable future he would attain the capacity to permit the

17  proceedings to go forward.  The Court set a further status conference for March 29, 2012.  (*See*

18  Docket Nos. 37, 39.)  Following that hearing, Al-Murisi was committed to the Federal Medical

19  Center in Butner, Norther Carolina ("FMC Butner").  According to the record, Al-Murisi

20  arrived at FMC Butner on January 20, 2012.  (*See* Forensic Evaluation at 1.)  On March 29,

21  2012, the parties appeared for a status conference, but Al-Murisi had not been returned to this

22  District, and neither the Court nor the parties had received a report from FMC Butner.  (*See*

23  Docket No. 40.)

24

25

26        [1]    Judge Alsup issued the Order based on this Court's unavailability.

27        [2]    According to the record, Al-Murisi did not arrive at the facility conducting the
    evaluation until September 9, 2011.  The Court granted an extension of time to complete the
28  evaluation based on that fact and based on the need to utilize Arabic interpreters.  (*See, e.g.,*
    Docket No. 32.)

3

1    On May 29, 2012, Robert G. Lucking, M.D. and Angela Walden Weaver, Ph.D.

2    prepared a Forensic Evaluation, in which they diagnosed Al-Murisi with ███████████

3    ███ and opined that Al-Murisi remained incompetent to stand trial and requested that the

4    Court issue an order permitting him to be involuntarily medicated with antipsychotic

5    medication.  (Forensic Evaluation at 15-16.)  Drs. Lucking and Weaver also requested that, if

6    the Court granted their request, that the Court extend Al-Murisi's period of commitment for a

7    full four months.  (Cover letter to Forensic Evaluation.)

8    On May 31, 2012, the parties appeared for a further status hearing.  Once again, Al-

9    Murisi had not been transported back to this District.  At that time, neither the Court nor the

10   parties had received a copy of the Forensic Evaluation.  (Docket No. 41.)  After the Court

11   received the Forensic Evaluation, it issued an Order requiring the parties to submit any

12   objections by no later than June 24, 2012.  (Docket No. 42.)

13   On July 31, 2012, the parties appeared before this Court for a hearing on the request to

14   medicate Al-Murisi involuntarily.  The Court heard testimony from Dr. Lucking.  At the

15   conclusion of the hearing, the parties requested that the Court defer ruling on the request.  The

16   Government also suggested that the Court extend the duration of Al-Murisi's commitment

17   pursuant to 18 U.S.C. Section 4241.  Al-Murisi, through counsel, consented to this request.  The

18   parties specifically suggested that Al-Murisi be returned to this District and continue to receive

19   mental health treatment with, if possible, a mental health provider who is fluent in Arabic.  The

20   parties also requested the additional period of commitment for purposes of determining whether

21   alternative forms of treatment would serve to restore Al-Murisi to competency and to allow for

22   the possibility that he might agree to take medication voluntarily.

23   On August 1, 2012, the Court issued an Order in which it found that an extension of Al-

24   Murisi's commitment period was warranted, and that there remained a substantial probability

25   that, with further treatment, he could be restored to competency.  18 U.S.C. § 4241(d)(2)(A).

26   With the consent of the parties, the Court extended the period of commitment from May 19,

27   2012, when the initial four month period of commitment under Section 4241 expired, to

28   September 27, 2012.

United States District Court

For the Northern District of California

1    On September 27, 2012, the parties submitted a status report, in which they advised the

2    Court that they had been unable to find a mental health professional who spoke Arabic and

3    requested that the Court issue an Order on the request to involuntarily medicate Al-Murisi.

4    Pursuant to the Court's Order, the parties have included additional medical records relating to

5    Al-Murisi's mental health.  (Docket No. 61, Ex. A.)

6    The Court shall address additional specific facts as necessary in the remainder of this

7    Order.

8                                    **ANALYSIS**

9    "The Supreme Court has thrice recognized a liberty interest in freedom from unwanted

10   antipsychotic drugs." *United States v. Williams*, 356 F.3d 1045, 1053 (9th Cir. 2004) (omitting

11   internal quotation marks and citations); *see also Sell v. United States*, 539 U.S. 166 (2003);

12   *Riggins v. Nevada*, 504 U.S. 127, 137 (1992)); *Washington v. Harper*, 494 U.S. 210, 221

13   (1990).  "[T]he Constitution permits the Government involuntarily to administer antipsychotic

14   drugs to a mentally ill defendant facing serious criminal charges in order to render that

15   defendant competent to stand trial," when four specific circumstances exist.  *Sell*, 539 U.S. at

16   179-81.  However, the circumstances that would permit a court to involuntarily medicate a

17   defendant solely for the purposes of rendering the defendant competent to stand trial "may be

18   rare."  *Id.* at 180; *see also United States v. Ruiz-Gaxiola*, 623 F.3d 684, 688 (9th Cir. 2010)

19   ("Orders authorizing involuntary medication pursuant to [*Sell*] standard are 'disfavored.'")

20   (quoting *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1137 (9th Cir. 2005)).

21   "A court need not consider whether to allow forced medication" to restore a defendant

22   to competency, "if forced medication is warranted for a *different* purpose, such as the purposes

23   set out in *Harper* related to the individual's dangerousness, or purposes related to the

24   individual's own interests where refusal to take drugs puts his health gravely at risk."  *Sell*, 539

25   U.S. at 182 (emphasis in original) (citing *Harper*, 498 U.S. at 225-26).  Thus, before ordering

26   involuntary medication for competency restoration purposes, a district court "should ordinarily

27   determine whether the Government seeks, or has first sought, permission for forced

28   administration of drugs on these other *Harper* type grounds; and, if not, why not."  *Id.* at 183;

United States District Court
For the Northern District of California

1   *see also United States v. Hernandez-Vasquez*, 513 F.3d 908, 914 (9th Cir. 2008) (stating that the

2   Supreme Court "clearly intends courts to explore other procedures ... before considering

3   involuntary medication orders under *Sell*") (quoting *Rivera-Guerrero*, 426 F.3d at 1137).

4       Drs. Lucking and Weaver determined Al-Murisi is not a danger to himself or others.

5   (*See* Forensic Evaluation at 15-16.)  Neither the Government nor Al-Murisi contest that

6   determination.  At the hearing, the Court asked counsel for the Government and for Al-Murisi

7   whether there was any other basis on which an involuntary medication order could be issued.

8   Both parties confirmed there were not.  Therefore, because there are no other bases to support a

9   request for involuntary medication, the Court will proceed directly to a *Sell* inquiry.  *See*

10  *Hernandez-Vasquez*, 513 F.3d at 914.

11      Under *Sell,* before the Court can order that Al-Murisi be involuntarily medicated for

12  purposes of restoring him to competency, it must make four findings: (1) important

13  governmental interests are at stake; (2) involuntary medication would significantly further those

14  interests; (3) involuntary medication is necessary to further those interests; and (4) involuntary

15  medication is medically appropriate.  *Sell*, 539 U.S. at 179-81; *Hernandez-Vasquez*, 513 F.3d at

16  913.  "[T]he government has the burden of establishing the facts necessary to allow it to prevail

17  as to each *Sell* factor by clear and convincing evidence."  *Ruiz-Gaxiola*, 623 F.3d at 692.

18      **1.    The Government Has Not Met Its Burden to Show that Important**
            **Governmental Interests Are At Stake.**
19

20      "The Government's interest in bringing to trial an individual accused of a serious crime

21  is important. ... Courts, however, must consider the facts of the individual case in evaluating the

22  Government's interest in prosecution."  *Sell*, 539 U.S. at 180.  The Court also must consider the

23  Government's "concomitant, constitutionally essential interest in assuring that the defendant's

24  trial is a fair one."  *Id.*  A determination of whether the Government has met its burden on this

25  factor "is primarily a legal question."  *Ruiz-Gaxiola*, 623 F.3d at 693.

26      One factor the Court may consider in evaluating the seriousness of the crime is to

27  consider the likely sentencing range under the United States Sentencing Guidelines ("USSG").

28  *See Hernandez-Vasquez*, 513 F.3d at 908.  Al-Murisi is charged with interference with flight

crew members and attendants in violation of 49 U.S.C. Section 46504.  In the parties' most recent status report, they agree that the applicable sentencing guideline is USSG Section 2A5.2, which has a minimum base offense level of 9.  (Docket No. 61, Status Report at 2:4.)  The parties also agree that the most likely applicable Criminal History Category is I.  (*Id.* at 2:5-6.)

The Government argues that Al-Murisi "recklessly endanger[ed] the safety of an aircraft," which would increase the base offense level to 18.  USSG § 2A5.2(a)(2).  Although Section 2A5.2 does not define the term "reckless," the Ninth Circuit has adopted the definition of reckless set forth in Section 2A1.4, application note 1.  *See United States v. Gonzalez*, 492 F.3d 1031, 1036 (9th Cir. 2007); *United States v. Naghani*, 361 F.3d 1255, 1263 (9th Cir. 2007).  Under that definition, "reckless" means "a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation."  USSG § 2A1.4, app. note 1.

If Al-Murisi were convicted, the Government would have a strong argument that his conduct meets the definition of reckless.  *See, e.g., Gonzalez*, 493 F.3d at 1037-38 (noting that "diversion of the aircraft, behavior that instills fear and terror in the other passengers or the flight crew, and threats that could result in harm to the aircraft are sufficient, depending on the combination of circumstances, to constitute reckless endangerment of the safety of the aircraft").  Thus, if the Court were to accept the Government's argument, and if he was not eligible for a reduction in his offense level based on acceptance of responsibility, Al-Murisi could face a term of imprisonment of 27 to 33 months.  If Al-Murisi was entitled to that reduction, he could face a term of imprisonment of 18 to 24 months.

Al-Murisi argues that he was in a psychotic state on the airplane and, thus, did not form the requisite mental state for the reckless endangerment enhancement to apply.  Al-Murisi also argues that even if the Court were to apply the enhancement, he would be entitled to a downward departure, pursuant to Section 5K2.13, Diminished Capacity.  Given the facts of this case, statements by Dr. Stewart, and Dr. Lucking's testimony, Al-Murisi has an equally strong argument on this issue.  If the Court were to accept Al-Murisi's arguments and applied a base

7

1   offense level of 9 and Criminal History Category I, Al-Murisi could face a term of

2   imprisonment of 4 to 10 months.

3        Al-Murisi has been incarcerated since on or about May 9, 2011.  Thus, he already has

4   been confined for approximately 16 months.  In *Sell*, the Supreme Court noted that the time a

5   defendant has spent in custody and that would be credited to any future sentence might

6   counterbalance the government's interest in bringing a particular defendant to trial.  *Sell*, 539

7   U.S. at 180.  If the Court accepts Al-Murisi's arguments, he already has been incarcerated for a

8   longer period of time than any potential sentence he might receive.  If the Court were to accept

9   the Government's argument, Al-Murisi has been incarcerated for about half of the potential

10   maximum term the Court could impose.  Thus, the fact that Al-Murisi has been incarcerated for

11   a significant amount of time, when compared with the maximum potential sentence, tends to

12   lessen the Government's interest in prosecuting this case.

13        Although Al-Murisi's most recent medical records maintain his previous diagnosis of

14   █████████████████████, and suggest that he now ███████████████████████████████

15   ████████████████████████, there is nothing in those records to suggest that Al-

16   Murisi is a danger to himself or to others in the institution.  (Joint Status Report, Ex. A.)

17   Further, the Government has not seriously argued that it would seek to have Al-Murisi civilly

18   committed.  Apart from the conduct underlying the offense, there is nothing in the current

19   record to suggest that, if released, Al-Murisi would be a danger to himself or others.  *See, e.g.,*

20   *Ruiz-Gaxiola*, 623 F.3d at 695 (finding that important governmental interests were at stake, in

21   part because defendant remained subject to an additional 53 to 78 months imprisonment and

22   possibility of civil commitment was weak).

23        For these reasons, the Court concludes that the Government has not shown by clear and

24   convincing evidence that important governmental interests are at stake.

25        **2.    The Government Has Not Met Its Burden to Show that Involuntary**
            **Medication Will Significantly Further Important Governmental Interests.**
26

27        The second inquiry the Court must make under *Sell* is whether "involuntary medication

28   will *significantly further*" the government interests at stake."  539 U.S. at 181 (emphasis in

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1  original).  Thus, the Court must find by clear and convincing evidence both that "administration

2  of drugs substantially likely to render defendant competent to stand trial," and that

3  "administration of the drugs is substantially unlikely to have side effects that will interfere

4  significantly with defendant's ability to assist counsel in conducting a trial defense, thereby

5  rendering the trial unfair."  *Sell*, 539 U.S. at 181; *Ruiz-Gaxiola*, 623 F.3d at 692.

6         Dr. Lucking has diagnosed Al-Murisi with ███████████████, which he reports is

7  "████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████

10  ████████████████████████████████████████████████ "

11  (Forensic Evaluation at 12-13.)  Dr. Lucking proposes to treat Al-Murisi with ██████  a

12  first generation anti-psychotic medication.  (*Id.* at 17-19, 24-26.)

13         In his report and at the hearing, Dr. Lucking focused on the fact that Al-Murisi's ███

14  ████████████████████████████████████████████████████

15  ██████████████████████ "  (*Id.* at 15.)  Dr. Lucking further opined that "██████

16  ████████████████████████████████████████████████████

17  ██████████████████████████████████████████████████

18  ██████ ... are substantially impaired to the extent that he is not competent to stand trial."  (*Id.*

19  at 16.)  At the hearing, Dr. Lucking agreed that psychotherapy could continue to be helpful to

20  Al-Murisi, but he testified that antipsychotic medication is necessary to treat ██████████

21  ██████  (*See also* Forensic Evaluation at 27.)  Al-Murisi has not disputed that treatment with

22  anti-psychotic medication is a clinically accepted treatment for individuals with ████████

23  ██████████

24         In the Forensic Evaluation, Dr. Lucking opines that treatment with anti-psychotic

25  medication can restore individuals with active psychotic illness to competency, and he notes

26  that patients who are suffering from a first episode of psychosis are more responsive to

27  treatment.  (*Id.* at 24-26.)  Because Al-Murisi has not previously been treated with anti-

28  psychotic medication, there is no evidence specific to Al-Murisi that would show whether or

United States District Court

For the Northern District of California

1    not such medication would be likely to restore him to competency, a point that Dr. Lucking

2    acknowledges.  (*See* Forensic Evaluation at 24.)  Al-Murisi has not disputed the statistics cited

3    by Dr. Lucking, and he has not produced any expert testimony to contradict Dr. Lucking's

4    opinion.  However, the statistics and literature cited by Dr. Lucking are overly general and do

5    not refer specifically to inmates who have been diagnosed with ███████████        In the

6    *Ruiz-Gaxiola* case, although there was some evidence relating to defendants who suffered from

7    the same disorder with which the defendant was diagnosed, the government's experts relied

8    heavily on general information to extrapolate that treatment with anti-psychotic medication

9    would be effective for the defendant.  *Ruiz-Gaxiola*, 623 F.3d at 698-700.

10           This type of reasoning has very little value to courts conducting the *Sell*
             inquiry... Instead of analyzing the defendant as an individual, the
11           government reports simply sets up syllogisms to explain its conclusions:
             (1) atypical antipsychotic medications are generally effective, (2) the
12           defendant will be given atypical antipsychotic medications, (3) therefore,
             atypical antipsychotic medication will be effective for the defendant.  To
13           hold that this type of analysis satisfies *Sell's* second factor would be to find
             that the government necessarily meets its burden in every case it wishes to
14           use atypical antipsychotic medication.

15   *Id.* at 700 (quoting *United States v. Evans*, 404 F.3d 227, 241 (4th Cir. 2005) (omitting brackets

16   and ellipses).

17           Although ██████████ is a "conventional" antipsychotic medication, the Court finds Dr.

18   Lucking's reasoning in this case to be no different from the reasoning rejected by the Ninth

19   Circuit in *Ruiz-Gaxiola*.  Thus, although the figures and studies cited in the Forensic Evaluation

20   stand uncontradicted, the Court finds that they are too general to establish by clear and

21   convincing evidence that Al-Murisi can be restored to competency if he is treated with

22   antipsychotic medication.

23           The side effects associated with ██████████ are discussed at pages 19-21 of the

24   Forensic Evaluation and, according to Dr. Lucking, certain side effects are more prevalent in

25   young males.  (Forensic Evaluation at 19.)  Dr. Lucking opined, however, that treatment with

26   ██████████ "would be substantially unlikely to produce side effects that would interfere with

27   his ability to assist his attorney in preparing a defense."  (Forensic Evaluation at 26.)  There are

28   no medical records in evidence that pre-date Al-Murisi's arrival in the United States from

10

1    Yemen.  Although Dr. Lucking acknowledged at the hearing that, as a result, he does not have a

2    complete medical history for Al-Murisi, he noted that the existing medical records included ████

3    ████████████████████████████████████████████████ that could make Al-Murisi more

4    susceptible to potential side effects.

5         In light of the Court's finding that the Government has not shown by clear and

6    convincing evidence that treatment with ████████ would be substantially likely render Al-

7    Murisi competent to stand trial, the Court does not reach the issue of whether the Government

8    has established by clear and convincing evidence that, if Al-Murisi was treated with

9    ████████ that treatment "is substantially unlikely to have side effects that will interfere

10   significantly with [his] ability to assist counsel in conducting a trial defense, thereby rendering

11   the trial unfair."  *Sell*, 539 U.S. at 181; *Ruiz-Gaxiola*, 623 F.3d at 692.

### 3.    The Government Has Not Met Its Burden to Show Involuntary Medication Is Necessary to Further the Government's Important Interests

14        The third finding required under *Sell* is that "involuntary medication is *necessary* to

15   further" the governmental interests at stake.  539 U.S. at 181 (emphasis in original).  In order to

16   make this finding, the Court must "find that any alternative, less intrusive treatments are

17   unlikely to achieve substantially the same results."  *Id.*  The Court also "must consider less

18   intrusive means for administering the drugs, *e.g.,* court order to the defendant backed by the

19   contempt power."  539 U.S. at 181.

20        The Court also concludes that the Government has not established by clear and

21   convincing evidence that involuntary medication is necessary to further the governmental

22   interests at stake.  In the forensic evaluation, and at the time of the *Sell* hearing, Dr. Lucking

23   noted that Al-Murisi's symptoms had improved without medication.  Further, the Government

24   has not provided the Court with any evidence that less intrusive means are either unavailable or

25   futile.  For example, the parties have not put forth any evidence that, since his return to this

26   District, Al-Murisi's family has been unable to convince him to take medication voluntarily.

27   Similarly, the Government could request, but has not, that the Court issue an order, backed by

28

**United States District Court**
For the Northern District of California

1   its contempt power, that directs Al-Murisi to continue to undergo mental health treatment and to

2   take any medication recommended by his mental health professional.

3          Accordingly, the Court also concludes that the Government has failed to meet its burden

4   to show by clear and convincing evidence that involuntary medication is necessary to serve

5   important governmental interests.

6      **4.      The Government Has Not Met Its Burden to Involuntary Medication Is Medically Appropriate.**

7

8          The fourth and final finding required under *Sell* is that "administration of the drugs is

9   *medically appropriate*, *i.e.*, in the patient's best medical interest in light of his medical

10  condition." 539 U.S. at 181 (emphasis in original). In the *Ruiz-Gaxiola* case, the Ninth Circuit

11  found it "noteworthy that the Court used the word 'patient' in its explanation of this prong ...

12  rather than the word 'defendant,' which it used int its discussion of the other three factors." 623

13  F.3d at 703. The court also stated that "[a] proposed regime of involuntary medication will not

14  ordinarily be medically appropriate unless it is, at the least, substantially likely to restore the

15  defendant to competency...." *Id.* Drs. Lucking and Weaver also did not discuss whether the

16  long-term benefits of treating Al-Murisi with ███████ would outweigh any potential long

17  term harms he might suffer. In light of the Court's finding on the second prong of the *Sell* test,

18  and in light of the fact that Dr. Lucking does not recommend treating Al-Murisi with

19  ███████ for any purpose other than to restore him to competency, the Court concludes that

20  the Government has not established by clear and convincing evidence that involuntary

21  medication is in Al-Murisi's best medical interest in light of his medical condition.

22                                      **CONCLUSION**

23          For the foregoing reasons, the Court denies the request for an order permitting Al-Murisi

24  to be medicated involuntarily. This ruling is without prejudice to the Government, or the

25  Bureau of Prisons, renewing this request should circumstances change.

26  //

27  //

28  //

United States District Court

For the Northern District of California

Similarly, if Al-Murisi, through counsel, believes that it would be appropriate to revisit this issue, he may file the appropriate motion with the Court.[3]

**IT IS SO ORDERED.**

Dated: November 1, 2012

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

United States District Court

For the Northern District of California

---

[3] On October 17, 2012, the Court issued an Order, in which it Court directed the parties to show cause why the under seal order version of this Order should not be filed in the public record, or, at a minimum, why a redacted version should not be filed. Having considered the parties' joint status report, dated October 26, 2012, the Court issues this redacted version of the under seal order, dated October 17, 2012.

13